STAPLETON, Circuit Judge,

dissenting:

I agree that we have jurisdiction to review the cease and desist order against Bailey and *940 the removal and prohibition order against Seidman. Unlike my colleagues, I would deny both petitions for review. As the Director noted at the beginning of his opinion, “[u]se of institutions by insiders for their own benefit has been one of the greatest threats to the safe and sound operation of savings associations and has exposed the Federal deposit insurance funds to significant risks.” App. 94. Fortunately, the risk created by the conduct of Seidman and Bailey in this matter did not result in actual loss to their savings association or to the Federal deposit insurance funds. That fortuity, however, does not mandate that we overturn the orders before us.
The Director found that Seidman had engaged in undisclosed negotiations with UJB to secure release of a substantial personal obligation by representing to UJB Crest-mont’s willingness to make end-user loans to financially qualified purchasers of a UJB debtor and had later obstructed the OTS’s investigation of the matter. The Director concluded that the self-dealing and the obstructive conduct provided independent bases for a removal and prohibition order. With respect to Bailey, the Director concluded that he had engaged in an unsafe and unsound banking practice by causing a commitment to be made on a loan to a partnership in which Seidman had a financial interest without disclosing the transaction to the Board of Directors or the Senior Loan Committee. I will examine each charge in turn.
I.
The ALJ and the Director found that Seid-man had arranged with Poole & Co. to pursue a request by him that UJB release him from his $4.45 million personal guarantee. They further found that Seidman drafted a letter for Risko to send on his behalf, along with a brief letter of his own asking for the release, pointing out that Seidman was the CEO of Crestmont, that Crestmont was entertaining requests for $1.7 million from prospective purchasers of property from Fulton Street Associates (“FSA”), a developer financed by UJB, and that Seidman’s personal guarantee created a conflict of interest problem which would foreclose Crestmont from acting favorably on those requests. Seidman was also found to have approved an addition to his draft representing that “Crestmont would be willing to consider future financing [of such purchasers], assuming qualified buyers.” App. 41. The letter was dispatched on May 31, 1991.
That the intended message was heard and understood is evidenced by the internal documents generated by UJB in response to Seidman’s request. The memo that went to UJB’s Real Estate Asset Management Committee stated:
UJB has been approached by Lawrence B. Seidman, principal and guarantor of Fulton Street, requesting the release of his personal guarantee. Mr. Seidman is Chairman of the Board of Crestmont Federal Savings and Loan, the institution providing end loan takeouts of our warehouse loan. Mr. Seidman has conflict of interest in approving these takeouts while serving as UJB’s guarantor and the project’s principal. Crestmont is currently reviewing $1.7MM in end loan financing requests in an illiquid market. In order to reduce our exposure in the project, it becomes necessary to release Mr. Seidman. The only other alternative would be to provide the end loan financing ourselves at roughly twice the dollar UJB already has out to Borrowers
Although Mr. Seidman shows a net worth of $1.4MM, his liquidity is only $116M. In addition, he has recently contributed equity to the project, further depleting his liquidity. He does generate an income of $225M p.a. as CEO of Crest-mont; however, he can be more valuable to the repayment of our loan as a source of end loan financing.
App. 42. UJB’s Executive Vice President Eberhardt initialed this memorandum and added: “Agree. End loan financing has been critical to recent sales success.”
Eberhardt testified that there was not a broad market for financing industrial condominium projects and that Crestmont was one of the few institutions willing to provide financing to potential purchasers of FSA’s in *941 dustrial condominiums at the Boonton site. The other members of the Committee agreed with Eberhardt’s views and Seidman was notified on June 7, 1991, that UJB would release his guarantee.
Seidman did not advise Crestmont’s Board of Directors or its President that he was seeking a release of his guarantee or that in pursuing a release he was trading on Crest-mont’s ability to provide end loan financing.
On June 1, 1991, an OTS examiner conducting an examination at Crestmont saw the first page of the draft letter sent in Risko’s name to UJB. OTS immediately commenced a formal investigation and Seidman’s deposition was taken. When questioned concerning the source of the arguments set forth in the letter favoring a grant of the release, Seidman gave the following testimony:
Q. Did you discuss with Mr. Risko what he would write?
A. I won’t say we discussed it. I saw the letter, but—
Q. Did you see the letter before he sent it to Mr. Eberhardt?
A. He thinks he sent it to me the day he sent it, and my secretary called him and told him I said it was okay, but I don’t recall seeing it, but I may have.
Q. Okay.
A. I wasn’t really — I’m sorry.
Q. Did you discuss with him what position you would take with UJB to seek release from your personal guarantee?
A. No.
Q. How did he know? Was it typical for him to write letters of this nature without discussing it with you?
A. He knew the details backwards, forward and upside down. He knew the deal much better than I did./ He was intimately involved in this transaction. I was the outside guy. I mean I was just the financial guy in this deal. I knew almost nothing about this transaction. He knew the tenants better than I did. He stayed on it much better than I did.
Q. Did you ask Mr. Risko — I am sorry. Let me show you OTS No. 7, which is a letter from James Risko to Robert Eber-hardt, dated May 31, 1991 and ask you if you recall seeing that letter.
A. Yes. This is the letter that I referred to before that Mr. Risko thinks he sent me the day he sent it to Mr. Eber-hardt.
Q. Okay. And that is the letter where you thought your secretary said you had read it and that you didn’t have any problems with it?
A. Right.
Q. Do you recall reviewing that letter?
A. No.
Q. Okay. Now, how did Mr. Risko come up with those reasons? Did you ever discuss with him, first of all, the fact that, and why don’t you give me the letter for a second.
Did you discuss with him the fact that your position as Chairman of Crestmont Federal Savings & Loan may make the financing of certain condo purchasers impossible if you were also a partner in Fulton Street?
A. No.
Q. Okay. Did you discuss with Mr. Risko the fact that the inability to finance the end users, does not serve the United Jersey Bank’s position or that of the developer?
A. Mr. Risko and I had a discussion two or three times. We had that discussion, like I said before. Even Bob Eber-hardt, who stated either Bob or George Rinneman or Stackhouse, that if there were any end users that they felt to be qualified, that they should send them to UJB, and most likely UJB would make a considerate effort to do those end loan financing.
So, I mean that was discussed at one of the meetings. I don’t know if Mr. Risko was in that part of the conversation or not.
App. 44-46.
As I have noted, the ALJ and the Director found, with ample record support, that Seid- *942 man was the author of all but the concluding sentence of the Risko letter and that he had approved the addition of that sentence. While acknowledging that Seidman had not been asked direct questions in his deposition about the authorship of the letter, both the ALJ and the Director found the above quoted testimony to be “intentionally misleading” with respect to the source of the message conveyed in the Risko letter.
During the remainder of the investigation, Seidman was found to have (1) asked Risko and another principal of Poole & Co. to destroy relevant documents, (2) requested Ris-ko to make false statements and avoid full disclosure and (3) personally destroyed material evidence in a fit of rage.
It is apparent to me from the text of the statute that Congress intended courts to defer the agency’s determination of what constitutes an “unsafe and unsound practice”.[1] As my colleagues acknowledge, Seidman’s efforts to obstruct the investigation of the regulating agency undeniably constituted an “unsafe and unsound practice.”[2] Since I cannot say the Director was arbitrary or capricious in similarly characterizing Seid-man’s secret negotiations with UJB, I would sustain the conclusion of the Director that Seidman’s conduct satisfied § 1818(e)(1)(A) in two different ways.
The legislative history of the Act provides the following general insight into what Congress meant by an “unsafe and unsound” practice:
[A]n “unsafe or unsound practice” embraces any action, or lack of action, which is contrary to generally accepted standards of prudent operation, the possible consequences of which, if continued, would be abnormal risk of loss or damage to an institution, its shareholders, or the agencies administering the insurance funds.
MCorp Fin., Inc. v. Bd. of Governors, 900 F.2d 852, 863 (5th Cir.1990) (quoting from 112 Cong.Rec. 26474 (1966)), aff'd in part, rev’d in part on other grounds, Board of Governors v. MCorp Fin., Inc., 502 U.S. 32, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991). I do not disagree with my colleagues that the required “abnormal risk of loss or damages” refers to something more serious than the consequences of a breach of contract in the regular course of the bank’s business. On the other hand, it seems clear from the above-quoted legislative history that the relevant “risk” is not that occasioned by the specific conduct engaged in in this particular case, but rather the risk that would be occasioned if similar conduct were “continued” as a way of doing business.
The record reflects that the market for end-user loans for industrial condominiums was thin. It further reflects that Boonton project had experienced financial difficulties, that few commercial lenders were willing to undertake end-user financing for that project, and the UJB, Boonton’s principal debt fmancer, was concerned about getting its money back. Crestmont had loan applications for a substantial amount of end-user financing from prospective purchasers of Boonton properties. It had not previously engaged in such financing and it was faced with a decision on whether it was in the bank’s best interest to extend credit under these circumstances. Seidman’s was a very influential voice in Crestmont’s decision making process on such matters.
It was against this background that Seid-man approached UJB seeking release of his guarantee without informing his fellow officers and directors. To secure that release, *943 he drafted, approved, and caused to be dispatched, the Risko letter. It was clearly not unreasonable for the ALJ and the Board to understand this as a successful effort by Seidman to use the bank’s ability to provide Boonton financing in order to secure a personal benefit. To be sure, Seidman testified that his letter was motivated by his desire to put Crestmont in a position to make loans he thought were desirable from its point of view and neither the ALJ nor the Director made a finding that this subjective motivation did not exist. It thus may be that Crestmont, as well as Seidman, under other circumstances might have benefitted from the release of Seidman’s guarantee. But Seidman’s reliance on his motivation ignores the fact that he failed to disclose his release and the representation he made as to Crestmont’s willingness to provide end-user financing to purchasers of Boonton property who were financially qualified.
While it is true that Seidman made no legally binding commitment on behalf of Crestmont in the course of seeking the release of his $4.5 million guarantee, it was not arbitrary and capricious for the Director to recognize that communications like Seid-man’s Risko letter and responsive actions like those of UJB would have a significant potential for affecting decision making at the bank, a potential that was greatly increased by Seidman’s failure to disclose his activities. It is not unrealistic, it seems to me, to believe that the judgment of someone in Seidman’s position on whether to undertake Boonton end-user financing would be influenced, if not altogether controlled, by his release. Nor, I believe, is it unrealistic, given Seidman’s failure either to reveal the release transaction to his co-fiduciaries or to disqualify himself from participating in discussions of Boonton’s financing, for the Director to perceive an abnormal risk that the bank’s decision making process regarding that financing would be substantially skewed.
In short, I do not think the Director acted arbitrarily or capriciously in concluding that a continuing practice of undisclosed trading on the chief executive’s corporate influence for personal benefit would hold an abnormal risk of loss or damage to the bank.
Turning to Section 1818(e)(1)(B), I would sustain the Director’s conclusions once again. While Seidman contends otherwise, the Director was clearly justified in concluding that Seidman benefitted from the release of his $4.5 million guarantee. I believe he was also entitled to find that Seidman benefitted from his obstructive tactics during the investigation. While I agree that, fortuitously, Seid-man did not benefit from his efforts to suborn perjury and destroy evidence, this leaves his materially misleading deposition testimony. In the words of the Director, “Seidman benefitted from his efforts by depriving the OTS of reliable and material evidence, thwarting the OTS enforcement action and hampering the prompt resolution of the self-dealing charges.” App. 120.
I do not agree with my colleagues’ apparent position that misleading testimony before an investigating regulatory agency cannot constitute an “unsafe and unsound practice” unless it is perjurious. Accordingly, I have no difficulty with the failure of the examiners to ask more specific questions. Nor can I agree with my colleagues that Seidman’s testimony was not materially misleading. As I read the transcript, Seidman did not acknowledge that he was the source of the strategy reflected in the Risko letter and, indeed, purposefully led the examiner to believe he was not. At the time of the deposition, the agency did not know that Seidman was the author of that strategy and that fact was clearly material to an investigation into whether Seidman had secretly traded on his influence at the bank to secure a release of his personal guarantee.
Finally, I turn to § 1818(e)(1)(C). Based on my reading of the Seidman deposition, the ALJ and the Director were justified in concluding that Seidman’s conduct involved “personal dishonesty” within the meaning of subsection (i). I also believe they were justified in finding that Seidman’s undisclosed negotiations with UJB demonstrated a “willful ... disregard for the safety and soundness” of the bank within the meaning of subsection (ii).
*944 “Willful” is a word that has different meaning in different contexts, and the courts have not yet defined it in the context of subsection (ii). Whatever the precise definition may turn out to be, however, I am satisfied that the “willful disregard” requirement of subsection (ii) is met in this case. The undisclosed negotiations with UJB found by the Director to be an unsafe and unsound practice were intentional and deliberate. That Seidman has a subjective appreciation of the wrongfulness of his conduct and of the risk conduct of that kind poses for a bank can reasonably be inferred from the fact that he tried to cover up his conduct when the investigation commenced.
II.
Mr. Bailey’s case is a more sympathetic one, but it seems relatively clear to me that the Director did not abuse his discretion in issuing a cease and desist order directing that Bailey’s conduct with respect to the Levine loan application not be repeated.
Steven Levine applied to Crestmont in December of 1990 for end-user financing for the purchase of a commercial condominium at the Boonton project. The Boonton Project was owned by FSA, a partnership in which Bailey knew Seidman was a general partner.
A mortgage commitment on the Levine application was issued by Crestmont on March 19, 1991, and modified on April 12, 1991. For some reason, Levine and FSA did not consummate the purchase at that time, and the commitment was not timely accepted. Negotiations continued, however, and a contract for the purchase, for the price of $466,680, was entered into on May 10, 1991. A superseding commitment letter was issued by Crestmont on May 19, 1991, through Bailey, committing to a loan of $375,000. The purchaser accepted the commitment letter after its expiration date, with delivery of a deposit check for $2,000, which was deposited by Crestmont.
Under Crestmont’s internal operating rules, any loan transaction in which an officer or director of Crestmont had an interest had to be submitted to the Senior Loan Committee for approval. Bailey, Seidman, and Crestmont’s then president, Mr. McClellan constituted the Senior Loan Committee. The bank’s commitments to the Levine financing were made without the approval of the Senior Loan Committee. Neither Mr. McClellan nor anyone else on Crestmont’s Board of Directors were informed before these commitments were made that Levine wished financing for a purchase of property from a partnership in which Seidman had a financial interest.[3]
Bailey asked Seidman and his partners on three occasions about the fact that Seidman had an interest in the transaction Levine wished to finance. On each occasion, he was advised that Seidman was “getting out” of FSA and it was Bailey’s understanding that Levine wouldn’t actually be given any money unless and until Seidman was “out.” As I have noted, Seidman did not get all the way “out” until UJB released his $4.45 million guarantee at some point after June 7, 1991. Indeed, when the commitments were made, Seidman and his partners were attempting to renegotiate FSA’s financing with UJB and Seidman’s participation was understood by all to be necessary to reaching an agreement with UJB on a reorganization. Agreement was reached on May 20, 1991, and it was on that day that Seidman signed his guarantee. Thus, at the time of each of the three bank commitments made to Levine with Bailey’s approval, Seidman had an interest in the transaction Levine intended to finance.
Bailey’s understanding that Levine would get no money until Seidman was “out” of FSA does not mean the Director erred in finding an “unsafe and unsound practice” and *945 issuing a cease and desist order. Conflicts of interest are important because of the potential they hold for undermining an institution’s decision making process. Here Seidman and Bailey made the decisions to commit the bank to Levine when Seidman had a conflicting interest and when Seidman’s and Bailey’s judgments were susceptible to being influenced by that conflicting interest. That is the crucial fact that makes Bailey’s conduct an “unsafe and unsound practice” in the Director’s eyes. Seidman and Bailey obviously had no plans to submit Levine’s loan application to the Senior Loan Committee or anyone else before the financing was issued. For better or for worse, if events had transpired as Seidman and Bailey anticipated in the Spring of 1991 they would, the bank would have made a substantial loan based on the judgment of Seidman and Bailey exercised when Seidman’s personal fortunes were very much still tied to those of FSA.
Crestmont’s loan policy prohibited loans being approved in the manner Seidman and Bailey approved the Levine financing precisely because a continuing practice of approving loans in that manner would pose an abnormal risk to the financial stability of the bank. I am unwilling to fault the Director for reaching the same conclusion Crestmont’s management did when it established its rules.
III.
I would deny the petitions of Seidman and Bailey for review.

. As the court noted in Groos Nat'l Bank v. Comptroller of Currency, 573 F.2d 889, 897 (5th Cir.1978):
[t]he phrase "unsafe or unsound banking practice” is widely used in the regulatory statutes and in case law, and one of the purposes of the banking acts is clearly to commit the progressive definition and eradication of such practices to the expertise of the appropriate regulatory agencies.

. My colleagues do not acknowledge that Seid-man's deposition testimony constituted "an unsafe and unsound practice" apparently because they do not find it materially misleading. As I explain hereafter in applying § 1818(e)(1)(B), I disagree.

. It is true, as my colleagues stress, that Seidman had disclosed his interest in FSA on the conflict of interest forms he had filed with the bank prior to the approval of the Levine financing and that McClellan testified he reviewed those forms from time to time. But the ALJ and the Director concluded, with record support, that because of Bailey's failure to submit the Levine application to the Senior Loan Committee, McClellan was not exposed to any communication alerting him to the fact that Levine’s application related to a purchase from FSA.